# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

Nº 05-CV-2283 (JFB)

---

SCOTTIE R. FLEMING,

Plaintiff,

VERSUS

COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION,

Defendant.

---

MEMORANDUM AND ORDER
September 26, 2006

---

JOSEPH F. BIANCO, District Judge:

Plaintiff Scottie R. Fleming brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c), challenging the final decision of defendant Commissioner of the Social Security Administration (the "Commissioner" and the "SSA," respectively) that Fleming was not entitled to disability insurance benefits ("DIB") or Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties move for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). For the reasons that follow, the defendant's motion is granted and the plaintiff's motion is denied.

I. BACKGROUND AND PROCEDURAL HISTORY[1]

A. Prior Proceedings

Plaintiff filed an application for disability insurance benefits and SSI on October 31, 2002, alleging disability as of August 1, 1996. (Tr. 48-50.)[2] Plaintiff last met the insured status requirements for Title II benefits through December 31, 2001. (Tr. 28, 51-53.) Plaintiff amended her alleged disability onset

---

[1] The background and procedural history as described in defendant's memorandum are not in dispute. (*See* Pl.'s Mem. at 1.)

[2] "Tr." citations are to the correspondingly numbered pages in the certified administrative record filed with the Court as part of the Commissioner's answer.

date to December 31, 2001, at her administrative hearing. (Tr. 2, 10-14.)

After plaintiff's application was denied, she requested a hearing. (Tr. 18-25; *see* 20 C.F.R. § 404.906(b)(4) and 416.1506(b)(4)). On February 15, 2005, plaintiff appeared and testified *pro se* before Administrative Law Judge ("ALJ") Jane Polisar.[3] (Tr. 201-29.) The ALJ considered plaintiff's claim *de novo*, and, on February 23, 2005, issued a decision finding that plaintiff was not disabled. (Tr. 6-16.)

Plaintiff requested Appeals Council review of the ALJ's decision. (Tr. 4-5.) On April 13, 2005, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review.

### B. Non-Medical Evidence

Plaintiff was born on January 2, 1956. (Tr. 48.) She completed high school and two years of college. (Tr. 61, 71.) From January 1986 to January 1994, plaintiff worked as a nurse's aide. (Tr. 67, 217.) Plaintiff also took care of a one year-old child in 2002. (Tr. 214-16.)

Plaintiff began treatment with Dr. Reddy in February 2003, and the scheduling of her visits with Dr. Reddy varied between one month and three months. (Tr. 217-18.)

Plaintiff testified that she could not work because of phobia with depression, hypertension, "joints movement," difficulty walking, constant pounding in her head, and inability to concentrate. (Tr. 218, 220-21.) Approximately every six months, "welfare" would evaluate her for work, but her "pressures" were always the same. (Tr. 218.) She also had arthritis in her fingers, and this condition caused her to drop things. (Tr. 225.)

Plaintiff stated that she lived alone in a second-floor, one-bedroom apartment. (Tr. 218, 222.) She took care of the cleaning as best as she could, and her landlady did her shopping and laundry. (Tr. 218-19.) Her apartment building did not have an elevator, and there were approximately ten stairs to climb to get to her apartment. (Tr. 222.) She could walk around the house, but could barely walk a block outside because her legs felt like they would lock up on her. (Tr. 219.) Plaintiff liked to read and she frequently went to the library. (Tr. 219.) She did not have many friends. (Tr. 219-20.) Plaintiff stated that she had been referred to a therapist, and that Paxil had been prescribed for her. (Tr. 220.) She was trying to locate a psychiatrist whose office was close to where she lived. (*Id.*) Various blood pressure medications had also been attempted. Her doctors had advised her to lose weight. (Tr. 221.) According to plaintiff, Dr. Reddy had prescribed a cane for her to use when walking outside. (Tr. 222.)

### C. The Medical Evidence

On October 6, 1999, plaintiff was seen at the Brooklyn Hospital Center ("BHC") complaining of "off and on" headaches and blurred vision. (Tr. 123.) She was taking a medication for high blood pressure. (*Id.*) On examination, plaintiff weighed 225 pounds, her blood pressure was 130/80, heart sounds were regular, and there was no evidence of edema. (*Id.*) She was diagnosed with hypertension and high cholesterol. (Tr. 123.) An ophthalmology appointment was

---

[3] Prior to obtaining plaintiff's testimony, the ALJ advised plaintiff of her right to legal representation and plaintiff indicated that she wanted to proceed without an attorney. (Tr. 203-06.)

2

scheduled for her, but she did not keep the appointment. (Tr. 123-24.)

An x-ray of plaintiff's right ankle was taken on November 16, 1999, but the film did not show any evidence of any acute injury. (Tr. 139.)

When seen on March 14, 2000, plaintiff weighed 233 pounds, and her blood pressure was 142/80. (Tr. 124.) She had no complaints except for occasional chest tightness. (*Id.*) She was oriented times three, her hearts sounds regular, and there was no extremity edema. (Tr. 124.) Her hypertension was fairly controlled on Norvase and Lopressor. She was on diet control for her high cholesterol. An electrocardiogram ("ECG") was advised, and plaintiff stated she would follow through if the tightness in her chest re-occurred. (*Id.*) A medication was also prescribed for her obesity. (Tr. 125.)

Three months later, on June 14, 2000, plaintiff was seen for follow-up and refill of prescriptions. (Tr. 125.) On examination, her blood pressure was 176/90, her neck was supple, no veins were extended, her lungs were clear, air entry was good, heart sounds were regular, and her abdomen was obese, soft and nontender. (*Id.*) There was no edema in her extremities, and peripheral pulses were present. (Tr. 125.) Plaintiff claimed that she had not been taking her blood pressure medication. (*Id.*)

On July 9, 2001, plaintiff was treated for hemorrhoids. (Tr. 126.) She weighed 230 pounds. (*Id.*)

In October 2002, plaintiff complained of pain in her right arm and chest tightness, which was relieved with a high blood pressure medication, Nexium. (Tr. 127.) Her blood pressure was 154/90; she weighed 242 pounds. She was in moderate pain, but the pain was not ongoing. (*Id.*) There were no significant findings on examination. (Tr. 127.) Range of motion of her right shoulder was limited secondary to pain. Dr. B. Reddy Kumshan thought that the tightness in her chest might be related to gastroesophageal reflux disease ("GERD"). (Tr. 128.) An x-ray of her right shoulder was scheduled. The dosages of her blood pressure medications were also increased. She was referred to the urology clinic to assess rectal bleeding. A pap smear, mammogram, and blood tests were also scheduled. (*Id.*)

An October 22, 2002 ECG was abnormal with findings of a nonspecific T wave abnormality, minimal voltage criteria for LVH (left ventricular hypertrophy), which possibly was a normal variant, and normal sinus rhythm. (Tr. 140.) The results of a mammogram and right upper quadrant sonogram were normal; a pelvic sonogram indicated a cystic lesion on her left ovary. (Tr. 101-03, 115, 136.)

In November 2002, plaintiffs blood pressure was 170/90, and her hypertension was still not well controlled. (Tr. 129.) Her medications were increased, and a stress test was scheduled. Tylenol had not relieved the pain in her right shoulder. (*Id.*) Tylenol #3 was prescribed. (*Id.*)

Plaintiff made two visits to the BHC in December 2002. (Tr. 130-31.) On December 12, 2002, she reported that her "off and on" right shoulder pain was relieved with Tylenol #3. (Tr. 130.) She continued to complain of rectal bleeding "off and on." (*Id.*) Her blood pressure was 150/90; her weight was 248 pounds. There were no gross neurological deficits. (Tr. 130.) An x-ray of her right shoulder showed no fracture or dislocation. (Tr. 138.) Diet and exercise were advised to

3

treat plaintiff's elevated cholesterol level. (Tr. 130.)

On December 30, 2002, plaintiff's blood pressure was 120/90; she weighed 247 pounds. (Tr. 131.) Examination findings were normal. A high fiber diet was advised. (*Id.*)

In December 2002, plaintiff underwent a screening examination at the HS Systems, Inc., a facility of the Human Resources Administration of the City of New York. (Tr. 107.) The physical examination was "WNL" (within normal limits). (*Id.*) Plaintiff's blood pressure was 220/120 and, based on this reading, immediate follow-up from her primary care physician was advised. (*Id.*)

Plaintiff returned to HS Systems, Inc. on December 23, 2002. (Tr. 106.) Elevated blood chemistries and an abnormal EKG test indicated that plaintiff required follow-up within a week with her primary care physician. (*Id.*)

In January 2003, plaintiff was seen at the Brooklyn Hospital Center for nutrition counseling and blood tests. (Tr. 132-34.) She also complained of difficulty sleeping. (Tr. 132.) Plaintiff's blood pressure ranged from 130-50/90 and her weight fluctuated between 249 and 250 pounds. (Tr. 132-34.) She had tested positive for Hepatitis B, but all other tests, including liver function tests, were within normal range. (Tr. 108, 134.) Ambien was prescribed to help her sleep. (Tr. 134.) Another medication, Procardia X, was prescribed to treat her hypertension. (*Id.*)

Diagnostic Status Reports pertaining to plaintiffs' participation in HS Systems' Wellness Program, Rehabilitation Services from January 3, 2003 to March 3, 2003, are also in the record. (Tr. 99, 104-05.) These reports indicated that treatment was warranted during this time period for hypertension and cardiovascular disease and that, as of December 18, 2002, plaintiff's GERD, joint derangement, obesity and high cholesterol were controlled and stable. (*Id.*)

In February 2003, plaintiff made four visits to the BHC. (Tr. 114, 116-18.) When seen on February 3, 2003, plaintiff's hypertension was better, but still not well-controlled. (Tr. 114.) Her blood pressure was 140/80; her weight was 252 pounds. (*Id.*) Examination findings were within normal limits. Depression needed to be ruled out and Paxil, an antidepressant, was prescribed. (Tr. 135.) Ambien was discontinued. A psychological consultation was advised. (*Id.*)

Plaintiff had no complaints when seen on February 10, 2003, for follow-up concerning the results of recent blood tests. (Tr. 116.) Her blood pressure was 150/100; her weight was 148 pounds. (*Id.*) There was no evidence of Hepatitis C infection. Liver function tests were to be repeated in six months. (*Id.*)

A February 20, 2003 computed tomography scan ("CT") of plaintiff's pelvis and abdomen revealed a left adnexal cyst on her left ovary. (Tr. 120-21.) The radiologist recommended further testing by transvaginal ultrasound and Doppler within four weeks. (Tr. 121.)

Plaintiff was seen for follow-up at BHC on February 24, 2003. (Tr. 118.) She denied any new complaints and requested assistance in completing forms for a wellness program operated by HS Systems. (*Id.*) Her blood pressure was 140/90; her weight was 253 pounds, and she measured 5 feet 4 inches. On examination, plaintiff's heart sounds and rhythm were regular and normal, her neck was

supple, veins were not extended, and there were no gross neurological deficits or any edema in the extremities. (Tr. 118.) A questionable history of depression was noted, but plaintiff denied any suicidal or homicidal ideations. She was to continue taking Paxil. (*Id.*) A psychological consultation had been recommended, but plaintiff had not followed through with this recommendation. (Tr. 118.) She was to continue taking Nexium for her GERD, maintain her low cholesterol, low fat diet, continue with Lipitor for her high cholesterol, and continue taking her high blood pressure medications. (*Id.*)

An HS Systems' Wellness Program Rehabilitation Plan for March 1, 2004, contained goals to address plaintiff's hypertension over a two-month time period. (Tr. 190.)

A June 1, 2004 "Notice of Termination" from HS Systems, Inc. explained to plaintiff that she was being terminated from HS Systems Rehabilitation Plan as of June 1, 2004, because she had failed to comply with one of her Rehabilitation Plan goals, which was to submit an end of plan status report from her treating physician. (Tr. 189.)

A second HS Systems' Diagnostic Status Report, this one reflecting a plan start date of February 3, 2005, is also in the record. (Tr. 187.) This report indicated that plaintiff's depressive disorder and hypertension, unspecified, required treatment, and that her uterine fibroids, cardiovascular disease, and unspecified internal derangement of the knee were stable and controlled conditions. (Tr. 187.)

Dr. Lacas A. Vacasa Reddi (the plaintiff knew her, and the transcript referred to her as, "Dr. Reddy") prepared a medical report on February 2, 2005. (Tr. 182-86.) This report reflected that plaintiff first received treatment from with Dr. Reddy on December 30, 2003, and on average, Dr. Reddy had seen plaintiff every six to eight weeks. (Tr. 182.) Dr. Reddy's diagnosis consisted of hypertension, depression, arthritis, gastritis, back pain, and hyperlipidemia. (*Id.*) A number of medications had been prescribed to treat these conditions. (Tr. 183.) Plaintiff's symptoms, according to Dr. Reddy, included back pain, tiredness, fatigue, and shortness of breath, "off and on." (Tr. 182.) Dr. Reddy assessed that plaintiff was capable of sitting two to three hours continuously, or six hours total; standing ten to twenty minutes continuously, or two hours total; and walking one half hour continuously, or two hours total in an eight-hour day. (*Id.*) Dr. Reddy was not able to assess plaintiff's capacity to lift and carry, or to perform postural limitations. (Tr. 184.) Also, plaintiff could not use her legs and feet for repetitive movements as in pushing and pulling because of arthritis and back pain. (Tr. 185.) There were no restrictions on plaintiff's ability to operate machinery, but there were moderate restrictions on her ability to drive a motor vehicle. Plaintiff also needed to avoid exposure to dust, fumes, gases, or marked changes in temperature and humidity. (*Id.*) According to Dr. Reddy, plaintiff's ability to work on a regular and continuous basis could cause her condition to deteriorate secondary to her arthritis and back pain. (Tr. 185.) According to Dr. Reddy, plaintiff was capable of traveling to and from work by bus on a daily basis. (Tr. 186.)

D. Consultative Examinations and State Agency Reviews

On January 22, 2003, Amina Khattak examined plaintiff. (Tr. 146-48.) Plaintiff told Dr. Kliattak that she had been hypertensive for the past six years, and she currently complained of lower back pain on

5

walking, which radiated to her right knee and right arm. (Tr. 146.) She also had a history of reflux esophagitis for the past ten years, but no gastroscopy had been done. Recently, she had been diagnosed with Hepatitis C and Hepatitis B. (*Id.*) Her medications included Tylenol #3, Lipitor, Benadryl, Cozaar, Nexium, Colace, Bacstra, Toprol XL, and aspirin. (Tr. 146.) Plaintiff told Dr. Khattak that she could walk two blocks, lift and carry ten pounds, shop for one hour, travel for two to three hours, climb two flights of stairs, and complete her homework. (Tr. 147.)

On examination, Dr. Khattak described plaintiff as well-developed, well-nourished, and obese. (Tr. 147.) She did not use any assistive devices. Her gait and station were normal; she could ambulate, and her posture was good. (*Id.*) Blood pressure was 140/90; vision in both eyes was 20/20 with glasses. (Tr. 147.) An examination of plaintiffs head, ears, eyes, nose and throat was normal. There was no enlargement in the lymph nodes or thyroid glands; there was no carotid bruits or jugular venous distention. (*Id.*) Plaintiff's lungs were clear; there was no wheezing, rales or rhonchi. (Tr. 147.) Plaintiff's heart sinus rhythm was normal; no murmurs or gallops were heard. Bowel sounds were normal. (*Id.*) There was no cyanosis, clubbing or edema in the extremities. (Tr. 148.) Femoral, posterior, tibial and dorsalis pedis pulses were normal. (Tr. 148.) Range of motion of the cervical spine, shoulder joints, elbow joints and wrist joints were normal. Supination and pronation were normal. (*Id.*) Tinel and Phalen signs were negative. Plaintiff could make a fist and approximate the thumb to all fingers. (Tr. 148.) Her grasp was good, and there was no impairment of fine and dexterous movements in either hand. (*Id.*) There were no tremors, swelling, deformity, instability or tenderness in any joint. Range of motion of the hips, knees, ankles, feet, and lumbar spine was normal. (Tr. 148.) Straight leg raising was within normal limits. There was no joint swelling, tenderness, instability or deformity. (*Id.*)

Neurologically, plaintiff was well-oriented to time, place and person. (Tr. 148.) She had good memory, good knowledge of her surroundings, and she was attentive. (*Id.*) Cranial nerves were intact; cerebellar functions were normal. Biceps, triceps and brachioradialis reflexes were normal. Knee jerks, ankle jerks and Babinski testing, were normal. Muscle tone, muscle strength, and motor and sensory pathways were all normal. (Tr. 148.) There was no muscle atrophy or clonus. (Tr. 148.)

Dr. Khattak diagnosed plaintiff as having lumbar spine radiating pain to her right knee and right arm. (Tr. 148.) She also had a history of hypertension and reflux esophagitis, and had recently been diagnosed with Hepatitis C and B. 14. She had no limitation of movement in any joint. A liver biopsy was scheduled for February 10, 2003; Dr. Khattak believed that a re-evaluation would be needed. (Tr. 148.)

Dr. Herbert Meadow, a psychiatrist, examined plaintiff at the request of SSA on April 24, 2003. (Tr. 142-45.) Plaintiff had no psychiatric treatment history other than a brief period in the late 80's when she was hospitalized for a medication overdose and saw a psychiatrist for approximately one or two sessions after her discharge from the hospital. (Tr. 142.) Plaintiff was taking Paxil, in addition to Lipotor, Toprol, Bextra, Cozaar and Nexium. (*Id.*)

On examination, Dr. Meadow described plaintiff as overweight, but she did not exhibit any psychomotor pathology. (Tr. 142.) Her speech was coherent and goal-directed, and

there was no loosening of associations, thought disorders, auditory or visual hallucinations, delusions, or paranoid ideations. (*Id.*) Plaintiff's mood was depressed; her affect was appropriate. (Tr. 142.) Plaintiff was oriented times three, and her general fund of information was within normal limits. (Tr. 142.) Recent and remote memory was grossly intact. Her intelligence level was in the low average to average range. (*Id.*) Plaintiff's insight and judgment were unimpaired. (Tr. 142.)

Plaintiff told Dr. Meadow that when at home, she watched television, listened to music, read, cleaned, and did her own cooking and shopping. (Tr. 142-43.) According to Dr. Meadow, plaintiff had dysthymia, mild to moderate with generalized anxiety, mild, but these conditions did not necessarily interfere with her ability to function in a low-pressured setting unless there were physical reasons why she could not function. (Tr. 143.)

Dr. Kessel, a state agency physician, reviewed plaintiff's record on May 8, 2003. (Tr. 157-74.) Dr. Kessel concluded that plaintiff had a dysthymic disorder, which resulted in mild functional limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence and pace. (Tr. 160, 167.) According to Dr. Kessel, plaintiff did not exhibit any significant limitations in her overall mental functioning. (Tr. 173.) She could understand, remember and carry out simple and detailed instructions; concentrate for extended periods of time; relate appropriately to co-workers and supervisors; and adapt to changes in the work-environment. (*Id.*)

E. Procedural History

Plaintiff filed a complaint on May 11, 2005, and the case was assigned to the Honorable Edward R. Korman. On February 8, 2006, this case was reassigned to this Court. On February 28, 2006, both parties cross-moved for judgment on the pleadings. Neither party submitted opposition papers or requested oral argument.

II. DISCUSSION

A. Applicable Law

1. Standard of Review

A district court may only set aside a determination by an ALJ which is based upon legal error or not supported by substantial evidence. *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)). The Supreme Court has defined "substantial evidence" in Social Security cases as "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Quiones v. Chater*, 117 F.3d 29, 33 (2d Cir. 1997) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (internal quotations and citations omitted). Furthermore, "it is up to the agency, not th[e] court, to weigh the conflicting evidence in the record." *Clark v. Commissioner of Social Security*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, even if there is substantial evidence for the plaintiff's position. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Jones v. Sullivan*,

949 F.2d 57, 59 (2d Cir. 1991). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey*, 145 F.3d at 111; *see also Jones*, 949 F.2d at 59 (quoting *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

2. The Disability Determination

A claimant is entitled to disability benefits under the Act if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the Act unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown*, 174 F.3d at 62 (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with regard to the first four steps; the Commissioner bears the burden of proving the last step. *Brown*, 174 F.3d at 62.

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "(1) objective medical facts and clinical findings; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability; and (4) claimant's educational background, age, and work experience." *Id*. (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

B. Application

The ALJ found that plaintiff had severe hypertension and arthritis, but she did not have an impairment or combination of impairments, which met or equaled any impairment in the Listing of Impairments. (*See* Tr. 11, 15.) The ALJ then determined that plaintiff had the residual functional

8

capacity to perform a wide range of sedentary work. (*Id.* 14, 15.) Finally, the ALJ concluded that the residual functional capacity possessed by plaintiff did not allow her to return to her past work, but, considering her vocational background, her age, high school education and two years of college, the ALJ concluded that a significant number of jobs existed in the national economy that plaintiff could perform. (*Id.* 16.)

In opposing defendant's motion and cross-moving for remand, plaintiff argues that the ALJ failed to develop the record by updating plaintiff's medical history, especially because plaintiff appeared *pro se* at the hearing. (Pl.'s Mem. at 1-7.) Specifically, plaintiff argues that Dr. Reddy's report "failed to spell out in meaningful detail the specific characteristics and effects of depression and anxiety" on plaintiff's condition. (*Id.* at 7.) The ALJ's "interpretation of Dr. Reddy's incomplete and confusing responses," according to plaintiff, was not supported by the record. (*Id.* at 8.) Plaintiff also argues that the ALJ should have called a vocational expert to testify. Finally, plaintiff argues that the ALJ failed to fully develop the record concerning plaintiff's ability to work based on her medical limitations and psychological problems. The Court addresses each argument in turn.

1. The ALJ Properly Developed the Record as to Dr. Reddy's Treatment

Plaintiff's contention that the ALJ failed to develop the treating physician's record is misplaced. Indeed, although the ALJ explained to plaintiff during the hearing that certain records, such as those of Dr. Reddy's, could be supplemented, there is nothing in the record to suggest plaintiff's medical history was not complete. *See Rosa v. Callahan*, 168 F.3d 72, 80 (2d Cir. 1999) (holding that an ALJ has a duty to obtain additional information from the treating physician if the underlying basis for the medical assessment is incomplete). The responsibility of an ALJ to fully and fairly develop the record is a "bedrock principle of social security law." *Silverio v. Barnhart*, 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) (citing *Brown*, 174 F.3d at 65); *see also Rosa*, 168 F.3d at 80 (holding ALJ should take steps to supplement incomplete record); *Schaal v. Apfel*, 134 F.3d 496 (2d Cir. 1998) (holding that if the treating physician's reports are inadequate, the ALJ has a duty to seek additional information). This responsibility is heightened when a claimant is unrepresented. *Echevarria v. Sec. of Health and Human Servs.*, 685 F.2d 751, 755 (2d cir. 1982).

Based on a review of the transcript, the Court finds that the ALJ fulfilled her duty to fully and fairly develop the record. At the hearing, the ALJ discussed with plaintiff what records were part of the file, and plaintiff indicated that certain records were missing. (Tr. 206-07.) The missing records included certain reports from her treating physician, Dr. Reddy, from 2003 until 2005. (*Id.*) Included in the record, however, is a February 2, 2005 disability medical report. (Tr. 182-86.) This report details the treating physician's finding regarding plaintiff's disability eligibility. This report was relied upon by the ALJ in reaching her decision.

Plaintiff refers to Dr. Reddy's report as "incomplete and confusing," but fails to articulate what about the report was flawed. Indeed, the report, as relied upon by the ALJ, was corroborated by the rest of the record, by the state agency physician, and by plaintiff's testimony. *See Aponte v. Secretary, Dep't of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). As the ALJ noted in her decision, Dr. Reddy "ha a longstanding history of treating claimant, and her determinations are supported by clinical findings and are consistent with the remainder of the medical evidence of record." (Tr. 13-14.) The Court, therefore, concludes that the

9

record with regard to plaintiff's treating physician was properly developed. *Yancey*, 145 F.3d at 111; *Jones v. Sullivan*, 949 F.2d at 59. The fact that the treating physician concluded that plaintiff was able to perform sedentary work, a conclusion that was supported by other medical evidence and plaintiff's testimony, does not support plaintiff's position that Dr. Reddy's report was "incomplete and confusing." Rather, it supports the ALJ's conclusion that the treating physician's opinion be given controlling weight.

### 2. A Vocational Expert Was Not Required to Determine Fleming's Ability to Perform Sedentary Work

As the Second Circuit has consistently held, the ALJ meets her burden at the fifth step "by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Sub. pt. P, App. 2 (1986)." *Rosa*, 168 F.2d at 78 (*quoting Bapp v. Bowen*, 802 F.2d 601, 604 (2d cir. 1986)). "The grids take into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience." *Rosa*, 168 F.2d at 604 (internal citation and quotation omitted). When, however, "the claimant's exertional impairments are compounded by significant nonexertional impairments that limit the range of sedentary work that the claimant can perform," a vocational expert must testify. *Id.* (quoting *Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996)). "An exertional limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (*i.e.*, sitting, standing, walking, lifting, carrying, pushing, and pulling)." *Rosa*, 168 F.3d at 78 n.2. "A nonexertional limitation is one imposed by the claimant's impairments that affect her ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments and pain." *Id.* (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997) (citing 20 C.F.R. § 404.1569a(a), (c))).

Plaintiff argues that a vocational expert was required to testify in this case because of evidence in the record of "mental impairments, and environmental problems such as the inability to tolerate dust, fumes, changes in temperature and hazards such as unprotected elevations and dangerous moving machinery." (Pl.'s Mem. at 10.) The Court disagrees. *See Butts v. Barnhart*, 388 F.3d 377, 387 (2d Cir. 2004) (holding that a "remand is proper where the error is found in the ALJ's failure to apply correctly the distinction between cases where reliance on the grid suffices and those where the testimony of a vocational expert is essential to the denial of benefits"); *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986) (holding "that the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines").

A vocational expert is only required when "a claimant's nonexertional impairments significantly diminish [her] ability to work – over and above any incapacity caused solely from exertional limitations – so that [she] is unable to perform the full range of employment indicated by the medical vocational guidelines." *Butts*, 802 F.2d at 603. Although certain non-physical impairments may require the testimony of a vocational expert, plaintiff's history of depression and testimony about mental problems did not provide sufficient evidence of non-physical impairment that so as to require a vocational expert. As the ALJ noted, the record showed that plaintiff was taking Paxil for depression, but nothing in the record indicated plaintiff's mental impairments diminished her ability to work "over and above any incapacity caused solely

10

from exertional limitations." *Id.* The same can be said of the ALJ's conclusion that plaintiff should not be exposed to certain environmental problems. As the ALJ noted, the range of sedentary jobs plaintiff could perform was not diminished by her nonexertional limitations. *See Bapp*, 802 F.2d at 606; *Ramos v. Barnhart*, 2006 WL 980570, at *12 (D. Conn. March 3, 2006) (remanding case when nonexertional limitations may diminish plaintiff's ability to work). This finding was supported by the record, including plaintiff's treating physician, other medical evidence, and her testimony at the hearing. *See Rosa*, 168 F.2s at 78. Hence, in this case, a vocational expert was not required because the grid provided a framework for determining the type of work plaintiff can perform. (*See* Tr. 14.) The record, when considered as a whole, supported the ALJ's conclusion that plaintiff's nonexertional limitations did not significantly narrow or diminish the range of sedentary work plaintiff can perform. (*Id.*). *See also Bapp*, 802 F.2d at 605-06; *Blacknall v. Heckler*, 721 F.2d 1179, 1181 (9th Cir. 1983); *Samuels v. Barnhart*, 2003 WL 21108321, at *11 (S.D.N.Y. May 14, 2003). Hence, the Court concludes that the ALJ was not required to call a vocational expert.

3. The ALJ Fully Developed the Record Concerning Fleming's Ability to Work Based on Her Medical and Psychological History

As discussed above, the ALJ concluded that, although plaintiff had testified that she had constant pounding in the head, and an inability to concentrate, plaintiff could still perform a wide range of sedentary work. Based on the record as a whole, the ALJ did not accept plaintiff's complaints based on their inconsistency with the medical evidence, and plaintiff's own testimony. (*See* Tr. 15.) The ALJ has an absolute duty and obligation to consider not only the plaintiff's testimony, but the record as a whole. *See Yancey*, 145 F.3d at 111; *Jones*, 949 F.2d att 59; *Kendall v. Apfel*, 15 F. Supp. 2d 262, 267 (E.D.N.Y. 1998); *Rosado v. Shalala*, 868 F. Supp. 471, 473 (E.D.N.Y. 1994). Indeed, "[i]t is the function of the Secretary, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Secretary, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (internal citations and quotations omitted). Here, although plaintiff complained of certain non-physical ailments, the ALJ discounted this testimony based on the medical evidence, and based on plaintiff's own testimony. *Id.* The medical evidence, including that of Dr. Reddy, found that plaintiff did not exhibit any significant limitations in her overall mental functioning. (Tr. 148, 173, 182.); *see Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *Rosario v. Sullivan*, 875 F. Supp. 142, 146 (E.D.N.Y. 1995). In addition, plaintiff testified that cleaned, shopped, did laundry, enjoyed reading, and had taken care of a small child for over a year. (Tr. 218-22.) Based on the doctors' findings, as well as plaintiff's own testimony, the record was fully developed concerning plaintiff's ability to work based on here nonexertional limitations. *See Yancey*, 145 F.3d at 111.

Therefore, the ALJ's conclusion that plaintiff was not disabled within the meaning of the Act, and that plaintiff could perform a wide range of sedentary work was aptly supported by the record. *Yancey*, 145 F.3d at 111; *Jones*, 949 F.2d at 59; *Valente*, 733 F.2d at 1041.

### III. CONCLUSION

For the reasons stated above, the defendant's motion for judgment on the pleadings is GRANTED, and plaintiff's cross-motion is DENIED. The Clerk of the Court is directed to enter judgment in favor of defendant and against plaintiff, and to close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 26, 2006
Central Islip, NY

\* \* \*

The attorney for the plaintiff is Herbert S. Forsmith, Esq., 26 Broadway, 17th Floor, New York, New York 10004. The attorney for the defendant is Karen T. Callahan, Esq., Special Assistant United States Attorney, Roslynn R. Mauskopf, Esq., United States Attorney, Eastern District of New York, One Pierrepont Plaza, 14th Floor, Brooklyn, New York 11201.